**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF:  K.N.M., MOTHER | : | |
| | : | |
| | : | No. 248 WDA 2025 |

Appeal from the Order Entered January 23, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000059-2024

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: September 24, 2025**

K.N.M. ("Mother") appeals from the order terminating her parental rights as to her minor child, L.M. ("Child"). She challenges the sufficiency of the evidence. We affirm.

Child was born in March 2023. At the time of Child's birth, the Allegheny County Office of Children, Youth and Families ("CYF") received a report that Mother and Child tested positive for drugs. N.T., 1/16/25, at 52-53. M.M. ("Father") is listed on Child's birth certificate, and he signed an acknowledgment of paternity.[1] *Id.* at 52. As a result of testing positive for drugs, Child stayed in the NICU for approximately one month. *Id.* at 53. Mother admitted to CYF that she used 10 to 20 bags of heroin a day during her pregnancy. *Id.* at 54. CYF offered Mother the opportunity to enter a

---

[1] Father filed an appeal from the order terminating his parental rights at No. 194 WDA 2025.

residential drug and alcohol treatment program where Child could be placed with her, but Mother declined. *Id.* at 86-87. When Child was discharged from the hospital, CYF obtained an emergency order and placed Child with Mother's cousin ("Foster Mother") and her husband ("Foster Father") (collectively, "Foster Parents"). *Id.* at 53. Child was adjudicated dependent in May 2023. *Id.* at 55. Child has been living with Foster Parents since her discharge from the hospital, and it is a pre-adoptive home. *Id.* at 26-27, 69.

On July 2, 2024, CYF filed a petition for involuntary termination of parental rights. A hearing on the petition was held on January 16, 2025. At the time of the hearing, Child had been in placement her entire life, or approximately 21 months. *Id.* at 70.

At the termination hearing, CYF presented the testimony of its case supervisor, Olivia Martin. Martin testified that Mother's goals were to complete substance abuse treatment, attend random drug screens, participate in supervised visits with Child, continue medically assisted treatment, and address intimate partner violence. *Id.* at 55, 57. Martin noted that Mother had a protection from abuse order against Father, but Mother continued to see him. *Id.* at 57-58, 78. Although Mother maintained contact with CYF, Martin testified that Mother did not complete any of her court-ordered goals. *Id.* at 56, 68. Martin explained that CYF made several referrals to Mother for substance abuse treatment. *Id.* at 75. Martin stated that Mother participated in three substance abuse programs, but she did not complete any of them. *Id.* at 62-63. Martin said that Mother was receiving methadone treatment, but

in December 2023, she was discharged from that program. *Id.* at 56, 62. Martin testified that CYF provided Mother with transportation assistance to attend drugs screens. *Id.* at 63. She stated that Mother "attended some of her drug screens, not all." *Id.* at 56. Martin said that visits with Child were initially at Foster Parents' home and supervised by Foster Parents but Foster Parents were "no longer were comfortable with that," so supervised visits were moved to the CYF office. *Id.* at 66. Martin testified that Mother was "fairly consistent" with visits, but she never progressed to unsupervised visits. *Id.* at 67, 68. CYF also had concerns about Mother's housing, as her roommate had substance abuse issues and had an active arrest warrant at the time of the housing assessment. *Id.* at 75-76.

Martin further testified although Mother "appears to have maintained her bond with" Child, Child is "very attached" to Foster Parents and is happy in her foster home with Foster Parents' other children. *Id.* at 68, 71, 86. She emphasized that Child needs permanency and termination of parental rights would best serve her needs and welfare. *Id.* at 71-72.

Cassie McElhain, CYF caseworker, testified that although Mother maintained contact with CYF, "Mother admits openly that she is in active addiction and is not interested in a rehabilitation program right now." *Id.* at 90. McElhain stated that Mother was "fairly consistent" with visits with Child. *Id.* at 94. She also indicated that Mother and Foster Parents have a good relationship. *Id.*

McElhain further testified that she observed love and affection between Child and Foster Parents. *Id.* at 105. She stated that Child is "very happy" in her foster home and "at her age she doesn't know any differently. This is just her home, this is her family." *Id.* at 94-95. McElhain stated that Foster Parents fully meet Child's day-to-day needs. *Id.* at 106.

Lori Marshall, a caseworker from A Second Chance, Inc., testified that Mother's visits with Child initially were supervised by Foster Parents and were liberally set up by Mother and Foster Parents. *Id.* at 112. However, Foster Mother requested that someone else supervise the visits because Foster Mother "wasn't sure if [Mother] would be high or not, and she said that [at] some of the[ visits,] she was nodding off[.]" *Id.* Supervised visits were moved to A Second Chance in June 2023. *Id.* Marshall testified that out of 83 visits that were scheduled, Mother attended 53 of the visits. *Id.* at 113-14. She explained that although visits were ordered to take place twice a week for one hour each, Mother received a three-hour visit with Child every Thursday due to transportation issues. *Id.* at 113, 120-21. Marshall noted that Mother interacts well with Child during the visits and "there's no negative interaction during her time." *Id.* at 115.

Marshall further testified that Child is "very attached" and "very bonded" to Foster Parents, particularly to Foster Father because he is at home with her during the day. *Id.* at 116-17, 119. Marshall also observed that Child has a good relationship and bond with Foster Parents' three other children. *Id.* at

117. She opined that all of Child's needs are being met in the foster home. *Id.*

Rachel Poole, a lab technician for the Allegheny County and Health Department's Drug and Alcohol Laboratory, testified that Mother was called in for 72 drug screens, but she only completed 27 screens and had three refusals. *Id.* at 6-7. Poole testified that Mother continued to test positive for illicit substances, including methamphetamines, fentanyl, synthetic opiates, cocaine and THC. *Id.* at 7-13.

Dr. Patricia Pepe, a licensed psychologist and expert in forensic psychology, testified that she conducted evaluations of Mother, Child, and Foster Parents on December 19, 2024, and her report was admitted as an exhibit. *Id.* at 19-20. As to Mother's evaluation, Dr. Pepe testified:

> [Mother] was cooperative, she . . . admitted that she had been using drugs and that she -- we talked about her not being involved in treatment, and she said she's very afraid of entering residential treatment because of her concern for withdrawal. She admitted that she's in active addiction, and . . . basically it seems that her fear of withdrawal is really interfering with her ability to become free from drugs. She did express she wasn't in a position to care for her child.

*Id.* at 21-22. Dr. Pepe stated that Mother's "judgment continues to be poor" and she has "a poor prognosis with continued drug addiction." *Id.* at 22. She pointed out that Mother grew up in an environment where both of her parents were addicts and, as a result, Mother has had problems with her personal interactions in maintaining positive relationships, is distrustful of others, and has a high level of parental stress. *Id.* at 23, 24. Dr. Pepe opined that Mother

- 5 -

does not "have the ability to parent at this time" due to being in an active addiction and living with a roommate who is also an addict. *Id.* at 25. Dr. Pepe estimated that it would take Mother approximately one year of sobriety to demonstrate that she would be able to parent Child. *Id.* at 33-34.

Dr. Pepe further recognized that Child exhibited "some bonding behaviors suggestive of an attachment" with Mother and Mother "exhibited positive parenting skills." *Id.* at 26. She observed that Child was happy to see Mother and Mother had a good understanding of Child's functioning. *Id.* at 25-26. Nonetheless, Dr. Pepe recommended that visits continue to be supervised because of Mother's addiction and emphasized that Child needs permanency through adoption. *Id.* at 28-29. Dr. Pepe testified that Child views Foster Parents as her "psychological parents" and her "primary attachment and primary bond" is with Foster Parents. *Id.* at 27, 29. She stated that Foster Parents' other children in the home are very attached to Child. *Id.* at 27. Although Dr. Pepe stated that it would benefit Child to continue to have some sort of contact with Mother, she opined that Child's "permanency would override any detriment to not having contact with [Mother]." *Id.* at 35.

At the conclusion of the termination hearing, the court terminated Mother's parental rights. This appeal followed.

Mother raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2)?

2. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(5)?

3. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(8)?

4. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Br. at 6.

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re G.M.S.*, 193 A.3d 395, 399 (Pa.Super. 2018). We "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)). "If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion." *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We will reverse a termination order "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of S.P.*, 47 A.3d at 826.

A party seeking to terminate parental rights has the burden of establishing grounds for termination by clear and convincing evidence. *In re Adoption of K.C.*, 199 A.3d at 473. "Clear and convincing evidence is evidence 'that is so clear, direct, weighty, and convincing as to enable the trier

of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). Under this provision, the trial court must engage in a bifurcated analysis prior to terminating parental rights:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted). To affirm the termination of parental rights, this Court need only affirm the trial court's decision as to any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, the court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), and (8). As only one basis for termination under Section 2511(a) is necessary, we will focus our attention on the court's termination of Mother's parental rights pursuant to Section 2511(a)(8). That section states:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Section 2511(a)(8) "sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been proven, the court "must next determine whether the conditions that led to the children's removal continue to exist." **Id.** "[T]he relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa.Super. 2009). "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [a]gency services." **In re Z.P.**, 994 A.2d 1108, 1118 (Pa.Super. 2010).

Here, Child had been out of Mother's care in excess of 12 months. Therefore, we next focus our inquiry on whether the conditions that led to Child's removal from Mother's care continued to exist at the time the court terminated Mother's parental rights.

The court found that the conditions that led to Child's removal from Mother's care continued to exist. *See* Trial Court Opinion, filed 3/24/25, at 26. The record supports the court's finding. The conditions that led to Child's removal was Mother's substance abuse. The evidence presented showed that Mother failed to complete substance abuse treatment and continued to test positive for drugs throughout the life of the case. N.T. at 7-13, 62-63. Mother, in fact, admitted to the CYF caseworker and Dr. Pepe that she was in active addiction and had no interest in seeking any treatment. *Id.* at 21-22, 90. She further conceded that she was not in a position to care for Child due to her drug addiction. *Id.* at 22. Because Mother failed to remedy the situation that led to Child's removal, and as discussed below, termination of parental rights would best serve the needs and welfare of Child, we find the trial court properly concluded that the requirements of Section 2511(a)(8) were satisfied.

We next consider the court's finding that termination was warranted pursuant to Section 2511(b). Under Section 2511(b), the trial court must consider "the developmental, physical and emotional needs and welfare of the child" to determine if termination of parental rights is in the best interest of the child. *See* 23 Pa.C.S.A. § 2511(b). The court must also examine the parent-child bond, "with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). However, the "mere existence of an emotional bond does

not preclude the termination of parental rights." ***In re N.A.M.***, 33 A.3d 95, 103 (Pa.Super. 2011).

In addition to examining the parental bond, the court must consider other important factors, including "the child's need for permanency and length of time in foster care," "whether the child is in a pre[-]adoptive home and bonded with foster parents," and "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***Int. of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023).

Here, the court addressed the nature and status of the bond between Mother and Child and determined that termination of Mother's parental rights was in Child's best interest:

> Mother's failure to maintain regular and consistent contact with Child impacted the nature and quality of the relationship with Child. Further, Mother failed to demonstrate her ability to the [c]ourt that she acquired and possessed the necessary skills to parent her Child and meet her individual developmental, physical and emotional needs. Mother demonstrated to the [c]ourt her continued struggles with chemical dependency. The record is replete with Mother's unsuccessful attempts at sobriety which affected her ability to establish a bond with a child that has never been in her care. Ms. Marshall also testified that the foster parents were concerned that Mother would appear for the visits high. Mother's actions continue to show that she places her substance abuse issues above the needs of the Child. It was Dr. Pepe's opinion that based on Mother's issues, she is not in the position to parent at this time, being that she is in active addiction, her ability to parent is compromised.

\*\*\*

- 11 -

> [A]lthough the record shows that Child exhibited some bonding behaviors with Mother that were suggestive of an attachment, at best, the testimony and evidence demonstrated that the Child was merely familiar and comfortable in Mother's presence for the brief period of the supervised time. In weighing whether termination would cause extreme, irreparable emotional consequences to the Child, there was no evidence that Child would suffer such consequence and termination is mitigated by residing in a safe, secure, supportive pre-adoptive home.

Trial Ct. Op. at 32-34 (footnotes omitted). The court also considered the evidence that Child was strongly bonded to her foster family, is happy in the foster home – which is a pre-adoptive home – and had been in care for 21 months in determining that termination of Mother's parental rights was in Child's best interest.

The record supports the court's factual findings and it committed no error of law or abuse of discretion. The evidence clearly shows that Child is secure, loved, and thriving in Foster Parents' pre-adoptive home, where she has lived in her entire life. Mother has never had Child in her care and has failed to demonstrate that she can meet Child's needs. There was testimony that while Child is familiar and comfortable with Mother, Child views Foster Parents as her "psychological parents" and her "primary attachment and primary bond" is with Foster Parents. N.T. at 27, 29. The evidence shows that Child would suffer no detrimental impact if Mother's parental rights were terminated. Accordingly, we agree with the court's finding that CYF proved by clear and convincing evidence that termination of Mother's parental rights was in Child's best interest.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>9/24/2025</u>